1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF OREGON

9                        PORTLAND DIVISION

10

11

12  YING CHANG,                              No. 3:12-cv-01884-HU

13          Plaintiff,                       **FINDINGS AND
                                             RECOMMENDATION**
14       v.

15  CITIMORTGAGE, INC., a foreign
    company,

16
            Defendant.
17  ─────────────────────────────

18  David Richardson
    Email: david@pdxlawgroup.com
19  PDX LAW GROUP PC
    621 S.W. Morrison Street, Suite 1200
20  Portland, OR 97205
    Telephone: (503) 546-0141
21  Facsimile: (503) 536-6843

22          Attorney for Plaintiff

23  Rochelle L. Stanford
    Email: rstanford@piteduncan.com
24  Tracy J. Frazier
    Email: tfrazier@piteduncan.com
25  PITE DUNCAN, LLP
    621 S.W. Morrison Street, Suite 650
26  Portland, OR 97205
    Telephone: (858) 750-7600
27  Facsimile: (619) 326-2430

28          Attorneys for Defendant

    Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

Before the Court is Defendant CitiMortgage, Inc.'s ("Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons that follow, Defendant's motion (ECF No. 11) to dismiss should be GRANTED in part and DENIED in part.

## I. FACTS AND PROCEDURAL HISTORY

These are the facts as recited in Plaintiff Ying Chang's ("Plaintiff") complaint: On November 13, 2003, Plaintiff and May Yang ("Yang") executed a mortgage loan promissory note in the amount of $150,400 for property located at 2944-2950 S.E. 129th Avenue, Portland, Oregon 97236 ("the property"). (Compl. ¶ 6.) The deed of trust lists SIB Mortgage Corp. as the lender, Mortgage Electronic Registration Systems, Inc. ("MERS") as the beneficiary, Plaintiff and Yang as the borrowers, and Fidelity National Title Company of Oregon as the trustee. (Compl. ¶ 6.) Defendant "is the servicer of Plaintiff's loan and now purports to be the owner of Plaintiff's loan" as well.[1] (Compl. ¶ 5.)

In October 2010, Plaintiff contacted Defendant and indicated that he wanted to obtain a lower interest rate on the existing loan. (Compl. ¶ 8.) Defendant denied Plaintiff's request and informed him that the denial was due to his lack of economic hardship. (Compl. ¶ 8.) Four months later, in February 2011, Defendant "independently—unprompted by Plaintiff—placed Plaintiff into a trial modification," which "increased Plaintiff's monthly

---

[1] On June 21, 2012, MERS, as nominee for SIB Mortgage Corp., executed a purported assignment of Plaintiff and Yang's trust deed directly to Defendant. (Compl. ¶ 7.)

Page 2 - FINDINGS AND RECOMMENDATION

payment from $975.49 to $1,917.47, purportedly in part to provide for escrow payments for taxes and insurance." (Compl. ¶ 9.) However, "Plaintiff had been and continues to pay taxes and insurances for the [p]roperty on his own—outside of escrow," and he "never agreed to enter into a trial modification or to the changes to his account." (Compl. ¶ 9.)

At the same time, Defendant began to withdraw the larger payment amount from Plaintiff's bank account, despite Plaintiff's attempts to cease the trial modification. (Compl. ¶ 10.) Defendant ultimately refused to refund the difference between Plaintiff's original monthly payment and the trial modification payment, and the "issue was only addressed when Plaintiff filed a formal dispute with his bank about the withdrawal." (Compl. ¶ 10.) While the matter was being investigated, Defendant's agent advised Plaintiff to not authorize the electronic withdrawal of funds from his account and to make his loan payments manually. (Compl. ¶ 11.) Plaintiff did exactly that, making his loan payment, which Defendant accepted and placed into a "hold" account rather than applying it towards Plaintiff's loan, in March of 2011. (Compl. ¶ 11.) However, Defendant "unilaterally refused" to accept the loan payments Plaintiff submitted thereafter. (Compl. ¶ 11.)

On April 13, 2011, Defendant force-placed fire insurance on the property with an effective date of January 27, 2011. (Compl. ¶ 12.) Over the course of the next year, Plaintiff attempted to resolve the dispute surrounding the modification of his loan to no avail, and Defendant "reported false, negative, and damaging information to credit bureaus on a monthly basis." (Compl. ¶ 13.) Significantly, in May or June 2011, Plaintiff applied for a "new

Page 3 - FINDINGS AND RECOMMENDATION

loan or modification" to resolve the issue and "fix" his account, as he had previously been instructed to do by Defendant's agent, but he was denied based on poor credit (e.g., a direct result of Defendant's improper credit reporting). (Compl. ¶ 14.)

In April 2012, the parties resolved "the trial modification and payment amounts issues," however, Defendant now represents that Plaintiff owes Defendant "over $17,000 for missed payments, late fees, and other penalties incurred due to [Defendant]'s own unilateral mistake." (Compl. ¶ 15.) As an example of Defendant's attempts to collect "unauthorized and improper fees," Plaintiff attached a letter dated May 21, 2012 from Defendant, indicating that (1) Defendant was responding to Plaintiff's "inquiry regarding the servicing fees and expense activity" on his account and (2) Plaintiff owed $1,082.50 in delinquency expenses, but did not owe any servicing fees. (Compl. ¶ 18, Ex. 5 at 1-2.)

Even though some of the parties' issues have been resolved, Plaintiff is still none too pleased since Defendant failed and/or refused to provide him with responsive service; treated him in bad faith; never attempted to determine the validity of the debt owed prior to commencing and/or continuing harassing, abusive and unlawful debt collection proceedings; failed to undertake a meaningful investigation, despite being informed of its own mistakes and errors; placed Plaintiff's account in collections and foreclosure; and called Plaintiff "on a nearly daily basis over [eighteen] months to collect on a debt that [it] ha[d] no right to collect." (Compl. ¶ 16.) Plaintiff also says that his emotional distress was further exacerbated by the fact that Defendant's "customer service system is designed to prevent telephone

Page 4 - FINDINGS AND RECOMMENDATION

1   representatives or their managers from correcting [Defendant]'s
2   accounting errors or halting [its] continuous and unfounded
3   collection efforts." (Compl. ¶ 17.)

4       Based on the aforementioned events, Plaintiff filed a
5   complaint on October 18, 2012, alleging violations of various
6   federal and state laws, including Oregon's Unlawful Trade Practices
7   Act ("UTPA"), OR. REV. STAT. § 646.605, Oregon's Unlawful Debt
8   Collection Practices Act ("UDCPA"), OR. REV. STAT. §§ 646.639-.643,
9   the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§
10  1692-1692p, and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.
11  §§ 1681-1681x.  Plaintiff also raises two common law theories of
12  liability: intentional infliction of emotional distress ("IIED")
13  and breach of contract.

14                      **II. LEGAL STANDARD**

15      A court may dismiss a complaint for failure to state a claim
16  upon which relief can be granted pursuant to Rule 12(b)(6).  In
17  considering a Rule 12(b)(6) motion to dismiss, the court must
18  accept all of the claimant's material factual allegations as true
19  and view all facts in the light most favorable to the claimant.
20  *Reynolds v. Giusto*, No. 08-CV-6261, 2009 WL 2523727, at *1 (D. Or.
21  Aug. 18, 2009).  The Supreme Court addressed the proper pleading
22  standard under Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*, 550
23  U.S. 544 (2007).  *Twombly* established the need to include facts
24  sufficient in the pleadings to give proper notice of the claim and
25  its basis: "While a complaint attacked [under] Rule 12(b)(6) . . .
26  does not need detailed factual allegations, a plaintiff's
27  obligation to provide the grounds of his entitlement to relief
28  requires more than labels and conclusions, and a formulaic

Page 5 - FINDINGS AND RECOMMENDATION

recitation of the elements of a cause of action will not do." *Id.* at 555 (brackets omitted).

Since *Twombly*, the Supreme Court has clarified that the pleading standard announced therein is generally applicable to cases governed by the Rules, not only to those cases involving antitrust allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). The *Iqbal* court explained that *Twombly* was guided by two specific principles. First, although the court must accept as true all facts asserted in a pleading, it need not accept as true any legal conclusion set forth in a pleading. *Id.* Second, the complaint must set forth facts supporting a plausible claim for relief and not merely a possible claim for relief. *Id.* The court instructed that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). The court concluded: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

The Ninth Circuit further explained the *Twombly-Iqbal* standard in *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009). The *Moss* court reaffirmed the *Iqbal* holding that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Moss*, 572 F.3d at 969 (quoting

Page 6 - FINDINGS AND RECOMMENDATION

1  *Iqbal*, 129 S. Ct. at 1949). The court in *Moss* concluded by

2  stating: "In sum, for a complaint to survive a motion to dismiss,

3  the non-conclusory factual content, and reasonable inference from

4  that content must be plausibly suggestive of a claim entitling the

5  plaintiff to relief." *Moss*, 572 F.3d at 969.

### III. DISCUSSION

**A.    Requests for Judicial Notice**

8      Both parties have asked the Court to take judicial notice of

9  documents outside of the pleadings. Plaintiff asks the Court to

10  take notice of property records from the Multnomah County assessor

11  database, which Plaintiff represents "are public documents known

12  within this jurisdiction that can be accurately and readily

13  determined from the public record and that are not subject to

14  reasonable dispute." (Pl.'s Req. Judicial Notice at 2.) Defendant

15  asks the Court to take judicial notice of documentation pertaining

16  to Plaintiff's application for the mortgage loan that is the

17  subject of his complaint.

18      Generally speaking, "a district court may not consider

19  materials beyond the pleadings in ruling on a Rule 12(b)(6)

20  motion." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016

21  n.9 (9th Cir. 2012). Among the exceptions to this general rule is

22  that the "court may take judicial notice of matters of public

23  record without converting a motion to dismiss into a motion for

24  summary judgment, as long as the facts noticed are not subject to

25  reasonable dispute." *Id.* (citation omitted). Indeed, as the

26  Supreme Court explained, "courts must consider the complaint in its

27  entirety, as well as other sources courts ordinarily examine when

28  ruling on Rule 12(b)(6) motions to dismiss, in particular,

Page 7 - FINDINGS AND RECOMMENDATION

1   documents incorporated into the complaint by reference, and matters

2   of which a court may take judicial notice." *Tellabs, Inc. v. Makor*

3   *Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also* FED. R.

4   EVID. 201(b) (establishing that judicial notice is appropriate for

5   facts "capable of accurate and ready determination by resort to

6   sources whose accuracy cannot reasonably be questioned.")

7        Because the documents provided by Plaintiff from the Multnomah

8   County assessor database are matters of public record, and because

9   Defendant did not object to any portion of the request, the Court

10  recommends granting Plaintiff's request for judicial notice.

11       As to Defendant's request for judicial notice, it appears that

12  Defendant believes the loan application documentation has been

13  incorporated into Plaintiff's complaint by reference. (*See* Def.'s

14  Req. Judicial Notice at 1) ("[Attached is] [a] true and correct

15  copy of Plaintiff's Loan Application Documentation for the mortgage

16  loan alleged in Plaintiff's Complaint, paragraph 6.")  However,

17  nowhere in the complaint does Plaintiff actually refer to an

18  application, nor does it appear that the documents form the basis

19  of Plaintiff's claims.  *See United States v. Richie*, 342 F.3d 903,

20  908 (9th Cir. 2003) ("Even if a document is not attached to a

21  complaint, it may be incorporated by reference into a complaint if

22  the plaintiff refers extensively to the document or the document

23  forms the basis of the plaintiff's claim.")

24       In addition, Plaintiff seems to dispute Defendant's contention

25  that the loan was for investment purposes. (*See* Pl.'s Resp. at 8

26  n.2) ("The land is residential, the multi-family units were

27  demolished, the lots were split, and the only house built on these

28  lots was sold to Plaintiff's nephew and niece, allowing this court

1 │ to infer the purchase of this property was for personal, family or

2 │ household purposes." (citing Pl.'s Req. Judicial Notice Ex. 1-4))).

3 │     In short, Plaintiff's loan application is not plead in the

4 │ complaint nor incorporated into his complaint by reference and the

5 │ Court cannot take judicial notice of facts that are in dispute. *See*

6 │ *Agustin v. PNC Fin. Servs. Group, Inc.*, 707 F. Supp. 2d 1080, 1086

7 │ (D. Haw. 2010) (declining to take judicial notice of facts,

8 │ including those derived from a loan application, that were in

9 │ dispute and not "central" to the plaintiff's complaint).

10 │ Accordingly, Defendant's request for judicial notice should be

11 │ denied.   Perhaps discovery will develop properly the issue of

12 │ whether the loan was for investment purposes.

13 │ **B.   Failure to State a Claim**

14 │     As discussed above, Plaintiff asserts six causes of action in

15 │ his complaint: (1) violation of the FDCPA; (2) violation of the

16 │ UDCPA; (3) violation of the UTPA; (4) violation of the FCRA; (5)

17 │ IIED; and (6) breach of contract.   Defendant moves to dismiss

18 │ Plaintiff's complaint in its entirety.   The Court will address

19 │ Defendant's arguments in turn.

20 │     **1.   FDCPA Claim**

21 │     Defendant's argument regarding Plaintiff's claim for violation

22 │ of the FDCPA is twofold: first, Defendant argues that Plaintiff's

23 │ FDCPA claim fails because creditors, mortgagors and mortgage

24 │ servicing companies are not debt collectors and are statutorily

25 │ exempt from liability; and second, Defendant argues that

26 │ Plaintiff's FDCPA claim fails because his investment mortgage loan

27 │ is not a consumer debt as contemplated by the FDCPA.

28 │

Page 9 - FINDINGS AND RECOMMENDATION

1   The FDCPA was enacted to "eliminate abusive debt collection
2   practices by debt collectors, to insure that those debt collectors
3   who refrain from using abusive debt collection practices are not
4   competitively disadvantaged, and to promote consistent State action
5   to protect consumers against debt collection abuses." 15 U.S.C. §
6   1692(e).  The statute defines "debt collector" as "any person who
7   uses any instrumentality of interstate commerce or the mails in any
8   business the principal purpose of which is the collection of any
9   debts, or who regularly collects or attempts to collect, directly
10  or indirectly, debts owed or due or asserted to be owed or due
11  another."  15 U.S.C. § 1692a(6).  As relevant to the instant case,
12  "[f]or the purpose of § 1692f(6), such term also includes any
13  person who uses any instrumentality of interstate commerce or the
14  mails in any business the principal purpose of which is the
15  enforcement of security interests."  15 U.S.C. § 1692a(6).  The
16  FDCPA provides a number of exceptions from the term "debt
17  collector," including:

> (F) any person collecting or attempting to collect any
> debt owed or due or asserted to be owed or due another to
> the extent such activity (I) is incidental to a bona fide
> fiduciary obligation or a bona fide escrow arrangement;
> (ii) concerns a debt which was originated by such person;
> (iii) concerns a debt which was not in default at the
> time it was obtained by such person; or (iv) concerns a
> debt obtained by such person as a secured party in a
> commercial credit transaction involving the creditor.

23  15 U.S.C. § 1692a(6)(F).  "Further, a 'creditor' is not a 'debt
24  collector' under the FDCPA."  *Rowe v. Educ. Credit Mgmt. Corp.*, 559
25  F.3d 1028, 1031 (9th Cir. 2009).

26  Plaintiff only alleges a violation of § 1692f(6) of the FDCPA.
27  (Compl. ¶ 21.)  Section 1692f(6) prohibits a "debt collector" from
28  using "unfair or unconscionable means to collect or attempt collect

Page 10 - FINDINGS AND RECOMMENDATION

any debt," such as "(6) [t]aking or threatening to take any nonjudicial action to effect disposition or disablement of property" when "(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest," "(B) there is no present intention to take possession of the property," or "(C) the property is exempt by law from such dispossession or disablement."   15 U.S.C. § 1692f(6)(A)-(C). Plaintiff claims that Defendant violated § 1692f(6) because it initiated foreclosure while an unrecorded assignment existed.  That is to say, because MERS is not a proper beneficiary under Oregon law—which lead to an unrecorded assignment in violation of Oregon Revised Statute ("ORS") 86.735(1)—Defendant used "unfair or unconscionable means" to attempt to collect a debt in violation of § 1692f(6)(A) and (C).

In support of his position, Plaintiff draws the Court's attention to Judge Hernandez's decision in *Lettenmaier v. Federal Home Loan Mortgage Corp.*, No. CV-11-156-HZ, 2011 WL 1938166 (D. Or. May 20, 2011), where a trustee—who initiated nonjudicial foreclosure proceedings on a residential property—unsuccessfully moved to dismiss the plaintiff's FDCPA claim for violation of § 1692f(6). *Id.* at *12.  Judge Hernandez's reasoning can be summarized as follows: (1) although there is disagreement over whether conduct occurring in the context of a nonjudicial foreclosure is actionable under the FDCPA as unlawful debt collection, there appears to be a consensus that to the extent the challenged conduct is alleged to be a violation of § 1692f(6), the putative defendant qualifies as a "debt collector," (2) this Court's decision in *Hulse v. Ocwen Federal Bank*, 195 F. Supp. 2d

Page 11 - FINDINGS AND RECOMMENDATION

1188, 1204 (D. Or. 2002) (concluding that a lender was not a "debt collector" under the FDCPA because the act of foreclosing on a trust deed was not the collection of a "debt," as defined in the statute) (Hubel, M.J.), is distinguishable because it only addressed a claim brought under § 1692f(1),[2] and (3) the line of cases holding that foreclosure-related actions failed to qualify as "debt collection" activities either excepted or did not discuss claims brought pursuant to § 1692f(6), *see, e.g., Montgomery v. Huntington Bank*, 346 F.3d 693, 700-01 (6th Cir. 2003) (concluding "that except for purposes of § 1692f(6), an enforcer of a security interest . . . does not meet the statutory definition of a debt collector under the FDCPA"); *Hulse*, 195 F. Supp. 2d at 1204. *Lettenmaier*, 2011 WL 1938166, at *12.

Since then, however, a number of cases interpreting the FDCPA "have held that loan servicers, lenders, mortgage companies, and trustees appointed pursuant to a deed of trust are not 'debt collectors,' *a prerequisite for application of Section 1692f(6)*." *Bostrom v. PNC Bank, N.A.*, No. 1:11-cv-00594-EJL-CWD, 2012 WL 3904379, at *6 (D. Idaho Aug. 17, 2012) (emphasis added). As the Ninth Circuit explained, the term "debt collector" does not include "mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing." *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (citation omitted); *Perry v. Stewart*

---

[2] Under § 1692f(1), a "debt collector" is prohibited from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

Page 12 - FINDINGS AND RECOMMENDATION

*Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) ("The legislative history of section 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned.")

A recent decision from the Western District of Washington adequately sums up this Court's view of the inquiry that must be undertaken in cases involving mortgage service companies: A mortgage service company could conceivably qualify as a "debt collector[] subject [to] § 1692f(6) of the FDCPA if [it] use[s] 'any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.'" *McDonald v. OneWest Bank, FSB*, No. C10-1952RSL, 2013 WL 858178, at *12 (W.D. Wash. Mar. 7, 2013) (quoting 15 U.S.C. § 1692a(6)). However, if the mortgage service company obtained the servicing rights to the plaintiff's loan before he defaulted (or if any other exemption applied, for that matter), it is exempt under § 1692a(6)(F). *McDonald*, 2013 WL 858178, at *12. This approach follows from *De Dios*, which noted that "[r]ather than deciding whether a debt servicer [or any other entity] falls under the primary definition of a debt collector," the "simpler path" is to determine whether one of the specified exemptions carry the day. *De Dios*, 641 F.3d at 1074.

Here, the complaint makes clear that Defendant became servicer of Plaintiff's loan prior to any alleged default. As a result, Defendant cannot be a "debt collector" for the purposes of the FDCPA. Plaintiff nevertheless argues that dismissal of the "entire FDCPA claim is inappropriate" because Defendant "cannot claim the

Page 13 - FINDINGS AND RECOMMENDATION

exemption" after it was assigned Plaintiff's loan on June 21, 2012. (Pl.'s Resp. at 10.)  Even if that were true, it is inescapable that the so-called debt collection activities Plaintiff complains of occurred while Defendant was servicing his loan, and Defendant obtained the servicing rights while Plaintiff's loan was in good standing.  (Compl. ¶¶ 8-16, 18, 21-22.)  Nor can Plaintiff escape the fact that, even if Defendant was assigned the loan in June 2012, Defendant still remained the servicer of a debt that was not in default when taken for servicing.  (Compl. ¶ 5.)  Accordingly, Plaintiff's FDCPA claim should be dismissed.  *See Jara v. Aurora Loan Servs.*, 852 F. Supp. 2d 1204, 1211-12 (N.D. Cal. Mar. 30, 2012) (reaching a similar conclusion).

### 2.   UDCPA Claim

Defendant next argues that Plaintiff's UDCPA claim "fails because Plaintiff does not allege any abusive debt collection method," and additionally because "Plaintiff's investment mortgage loan is not a consumer debt under the UDCPA."  (Def.'s Mot. Dismiss at 3.)

Oregon enacted the UDCPA to prohibit debt collectors from using certain abusive practices against consumers.  *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 880 (9th Cir. 2011).  For example, ORS 646.639(2) states that "[i]t shall be an unlawful collection practice for a debt collector, while collecting or attempting to collect a debt" to undertake actions such as to "[a]ttempt to or threaten to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist, or threaten to take any action which the debt collector in the regular course of business does not take" or "[c]ollect or attempt to collect any

Page 14 - FINDINGS AND RECOMMENDATION

interest or any other charges or fees in excess of the actual debt unless they are expressly authorized by the agreement creating the debt or expressly allowed by law." OR. REV. STAT. § 646.639(2).

The UDCPA defines a "debt collector" as "any person who by any direct or indirect action, conduct or practice, enforces or attempts to enforce an obligation that is owed or due to any commercial creditor, or alleged to be owed or due to any commercial creditor, by a consumer as a result of a consumer transaction." OR. REV. STAT. § 646.639(1)(g).[3] The UDCPA defines a "consumer transaction" as a transaction between a "consumer"—e.g., a "person who purchases or acquires property, services or credit for personal, family or household purposes"—and "a person who sells, leases or provides property, services or credit to consumers." OR. REV. STAT. § 646.639(1)(a)-(b).

The essence of Defendant's latter argument is that Plaintiff's UDCPA claim fails as a matter of law because Plaintiff purchased the property for investment purposes, which means that Plaintiff's loan was not a "consumer transaction" within the meaning of the UDCPA. (See Def.'s Mot. Dismiss at 10.) As stated in Part III.A., since the Court declined to take judicial notice of the loan application, Defendant's motion to dismiss Plaintiff's UDCPA claim should be denied on this ground. Discovery may later support a motion for summary judgment on this theory, but it is premature now.

Defendant also contends that Plaintiff's UDCPA claim fails because he does not allege any abusive debt collection method. In

_____

[3] Unlike the FDCPA, there does not appear to be any statutory exemptions to the definition of a "debt collector."

Page 15 – FINDINGS AND RECOMMENDATION

paragraph 24 of his complaint, Plaintiff alleges that Defendant violated the UDCPA by "[c]ommunicating with [him] repeatedly or continuously or at inconvenient times" "with the intent to harass or annoy." (Compl. ¶ 24.)   One unlawful practice under the UDCPA is "communicating with the debtor or any member of the debtor's family repeatedly or at times known to be inconvenient." *Blair v. Bank of Am., N.A.*, No. 10-cv-946-SI, 2012 WL 860411, at *12 (D. Or. Mar. 13, 2012).   The Court concludes that the allegations in paragraph 24 of the complaint, along with the allegations described in Part I, sufficiently allege an unlawful debt collection method. Accordingly, Defendant's motion to dismiss Plaintiff's UDCPA claim should be denied on this ground as well.

### 3.   UTPA Claim

Defendant claims that Plaintiff's UTPA claim fails because (1) Plaintiff does not allege any unconscionable debt collection tactic; and (2) Plaintiff's investment mortgage is not a consumer debt under the UTPA.   For the reasons stated *supra*, the Court limits its analysis to Defendant's first argument.

Under ORS 646.605(9), "unconscionable tactics" include, but are not limited to, actions by which a person:

(a) Knowingly takes advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement;

(b) Knowingly permits a customer to enter into a transaction from which the customer will derive no material benefit;

(c) Permits a customer to enter into a transaction with knowledge that there is no reasonable probability of payment of the attendant financial obligation in full by the customer when due; or

(d) Knowingly takes advantage of a customer who is a disabled veteran, a disabled servicemember or a

Page 16 - FINDINGS AND RECOMMENDATION

1  servicemember in active service, or the spouse of a
2  disabled veteran, disabled servicemember or servicemember
   in active service.

3  OR. REV. STAT. § 646.605(9); *see also Baldin v. Wells Fargo Bank,*
4  *N.A.*, No. 3:12-cv-648-AC, 2013 WL 794086, at *9 (D. Or. Feb. 12,
5  2013) ("[T]he express language of the statute [indicates] that an
6  'unconscionable tactic' may include, *but is not limited to*, the
7  enumerated actions.") (emphasis in the original).

8      In paragraph 27 of his complaint, Plaintiff alleges that
9  Defendant violated the UTPA by, among other things: (1) placing him
10 into a trial modification without his authorization; (2)
11 withdrawing unauthorized amounts from his bank account; (3)
12 assessing improper and unauthorized fees; (4) causing confusion as
13 to the parties' relationships, rights, and services; (5)
14 misrepresenting information set forth in a certification,
15 declaration, or other statement; and (6) force-placing insurance on
16 the property while Plaintiff was privately maintaining insurance.
17 Seen in the light most favorable to Plaintiff, the Court concludes
18 that paragraph 27 of the complaint, along with the facts described
19 in Part I, sufficiently allege an "unconscionable tactic," as that
20 term is defined under the UTPA. Accordingly, Defendant's motion to
21 dismiss Plaintiff's UTPA claim should be denied.

22 **4.   FCRA Claim**

23     Congress enacted the FCRA in 1970 "to ensure fair and accurate
24 credit reporting, promote efficiency in the banking system, and
25 protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 127 S.
26 Ct. 2201, 2205 (2007). Importantly, "to ensure that credit reports
27 are accurate, the FCRA imposes some duties on the sources that
28 provide credit information to [consumer reporting agencies], called

Page 17 - FINDINGS AND RECOMMENDATION

'furnishers' in the statute." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009). "The most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies." *Id.* at 1154 (quoting H.R. Rep. No. 108-263, at 24 (2003)). Section 1681s-2 sets forth "[r]esponsibilities of furnishers of information to consumers reporting agencies," delineating two categories of responsibilities.

Section 1681s-2(a) details the duty "to provide accurate information," and includes the following duty:

(2) Duty to correct and update information

A person who --

(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

15 U.S.C. § 1681s-2(a)(2).

Section 1681s-2(b) provides that, after receiving a notice of dispute, the furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency . . . ;

Page 18 - FINDINGS AND RECOMMENDATION

1

2
    (C) report the results of the investigation to the consumer reporting agency;

3

4
    (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information . . . ; and

5

6

7

8
    (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (I) modify . . . (ii) delete . . . or (iii) permanently block the reporting of that item of information [to credit reporting agencies].

9  15 U.S.C. § 1681s-2(b). The aforementioned duties "arise only

10 after the furnisher receives notice of dispute from a [consumer

11 reporting agency]; notice of a dispute received directly from the

12 consumer does not trigger furnishers' duties under [§ 1681s-2(b)]."

13 *Gorman*, 584 F.3d at 1154.

14     Here, "Plaintiff does not allege a violation of 15 U.S.C. §

15 1681s-2(b)," rather he asserts that Defendant violated § 1681s-

16 2(a)(2). (Pl.'s Resp. at 13-14.) This is fatal to Plaintiff's

17 FCRA claim. As the Ninth Circuit explained in *Gorman*, "§ 1681s-2

18 limits [any] private right of action to claims arising under

19 subsection (b), the duties triggered upon notice of a dispute from

20 a [consumer reporting agency]. . . . Duties imposed on furnishers

21 under subsection (a) are enforceable only by federal or state

22 agencies." *Gorman*, 584 F.3d at 1154. Applying *Gorman*, several

23 courts have dismissed FCRA claims brought pursuant to § 1681s-2(a).

24 *See, e.g., Saccato v. Davis Law Firm*, No. 12-35133, 2012 WL

25 5951608, at *1 (9th Cir. Nov. 26, 2012) ("The district court

26 properly dismissed [the plaintiff]'s original complaint without

27 leave to amend because . . . 15 U.S.C. § 1681s-2(a) . . . [does

28

Page 19 - FINDINGS AND RECOMMENDATION

1  not] provide a private right of action.") Accordingly, Plaintiff's

2  FCRA claim under § 1681s-2(a) should be dismissed with prejudice.

3  **5.   IIED Claim**

4      Defendants claim that Plaintiff's IIED claim should be

5  dismissed because "conduct which occurs as part of loan servicing,

6  loan modification, debt collection or foreclosure" is not extreme

7  and outrageous as a matter of law. (Def.'s Mot. Dismiss at 4.)

8      In order to state a claim for IIED, Plaintiff must allege

9  plausible facts demonstrating that: "(1) the defendant intended to

10  inflict severe emotional distress on the plaintiff, (2) the

11  defendant's acts were the cause of the plaintiff's severe emotional

12  distress, and (3) the defendant's acts constituted an extraordinary

13  transgression of the bounds of socially tolerable conduct." *McGanty*

14  *v. Staudenraus*, 321 Or. 532, 543 (1995) (quoting *Sheets v. Knight*,

15  308 Or. 220, 236 (1989)). According to the *McGanty* court, an

16  allegation that the "defendant[] acted volitionally with knowledge

17  that the acts would cause severe emotional distress is sufficient

18  to establish [the] intent" element of the tort of IIED. *Id.* at 551

19  (citation and internal quotation marks omitted).

20      Plaintiff alleges that the following actions by Defendant

21  caused him emotional distress, amounted to intentional and

22  outrageous conduct, and caused him damages: (1) placing Plaintiff

23  into a trial modification plan using false, fraudulent, or

24  unauthorized means; (2) increasing Plaintiff's payment and

25  attempting to collect the increased amount; (3) force-placing

26  insurance on Plaintiff's property while Plaintiff was privately

27  maintaining insurance; (4) reporting false, negative, and damaging

28  information to credit bureaus; (5) encouraging Plaintiff to apply

1  for a new loan or modification to "fix" the mistakes on his
2  account, only to deny this application because of Defendant's own
3  false credit reporting; (6) misrepresenting the true owner of
4  Plaintiff's loan; (7) misrepresenting the ownership, servicing
5  rights, trustee, or other legal interests in the promissory note
6  and deed of trust; (8) employing unconscionable tactics while
7  rendering mortgage services and attempting to collect or enforce an
8  obligation; (9) placing Plaintiff in a position of likely
9  continuing default and exploiting that position for Defendant's
10 unjust enrichment; (10) attempting or threatening to enforce a
11 right or remedy with knowledge or reason to know that the right or
12 remedy does not exist, or threatening to take any action which in
13 the regular course of business it does not take; (11) causing the
14 likelihood of confusion or of misunderstanding as to the source,
15 sponsorship, approval, or certification of real estate, goods or
16 services; (12) causing the likelihood of confusion or of
17 misunderstanding as to affiliation, connection, or association
18 with, or certification by, another; and (13) failing to adhere to
19 the standard of the UTPA, UDCPA, and FDCPA.  (Compl. ¶ 39.)

20      In *Schmelzer v. Wells Fargo Home Mortgage*, No. CV-10-1445-HZ,
21 2011 WL 5873058 (D. Or. Nov. 21, 2011), Judge Hernandez addressed
22 a similarly exhaustive list of allegations in support of an IIED
23 claim stemming from an arm's length commercial transaction.  There,
24 the plaintiff argued that eleven different specified actions—all of
25 which occurred as part of loan servicing, loan modification, debt
26 collection, or foreclosure—caused her extreme emotional distress,
27 were intentional and outrageous, and caused her damages.  *Id.* at
28 *13-14.  After noting that the "trial court plays a gatekeeper role

Page 21 - FINDINGS AND RECOMMENDATION

in evaluating the viability of an IIED claim by assessing the
allegedly tortious conduct to determine whether it goes beyond the
farthest reaches of socially tolerable behavior," *id.* at *14
(quoting *House v. Hicks*, 218 Or. App. 348, 358 (2008)), Judge
Hernandez dismissed the plaintiff's IIED claim with prejudice,
stating:

> Defendants argue that plaintiff's allegations do not
> state an IIED claim because defendants' acts, as a matter
> of law, do not constitute an extraordinary transgression
> of the bounds of socially tolerable conduct.  I agree
> with defendants.
>
> Plaintiff['s] factual assertions are that in the context
> of an arm's length commercial relationship, defendants
> allegedly breached a contract, misrepresented authority
> (by claiming to have a beneficial interest in property
> when plaintiff contends they did not), allegedly stalled
> on her loan forbearance requests in an attempt to add
> fees to the amount of principal and interest already owed
> by plaintiff, and allegedly violated various . . . state
> and federal debt collection practices laws.
>
> This alleged conduct all occurred as part of loan
> servicing, loan modification, debt collection, or
> foreclosure.  While this may be stressful to the
> homeowner, [it] is not outrageous in the extreme.  I
> dismiss this claim.

*Schmelzer*, 2011 WL 5873058, at *14.

In this case, as in *Schmelzer*, all of the actions complained
of occurred as part of loan servicing, loan modification, debt
collection, or foreclosure.  In many instances, the Court agrees
that a creditor's conduct may well be stressful to the debtor
without exceeding the farthest reaches of socially tolerable
behavior.  But that is not to say that a creditor's conduct may
never exceed that limit and thus support an IIED claim.  The facts
are sufficiently alleged at this motion to dismiss stage to state
a plausible claim and allow the claim to go forward.  Whether it

1   will withstand a summary judgment motion after discovery is
2   unclear.

3       **6.    Breach of Contract Claim**

4       To state a claim for breach of contract under Oregon law,
5   "[P]laintiff must allege the existence of a contract, its relevant
6   terms, [P]laintiff's full performance and lack of breach and
7   [D]efendant's breach resulting in damage to [P]laintiff." *Slover*
8   *v. Or. State Bd. Of Clinical Soc. Workers*, 144 Or. App. 565, 570-71
9   (citation and internal quotation marks omitted).   For example, in
10  a case involving a mortgage loan, the plaintiff-borrower's
11  allegations must plausibly suggest that he "substantially complied
12  with the terms of the [n]ote or [deed of trust]." *Vettrus v. Bank*
13  *of Am., N.A.*, No. 6:12-cv-00074-AA, 2012 WL 5462914, at *7 (D. Or.
14  Nov. 6, 2012).

15      Defendant asserts that Plaintiff's breach of "contract fails
16  as a matter of law" because he "does not and cannot show his own
17  full performance and lack of breach." (Def.'s Mot. Dismiss at 12.)
18  In response, Plaintiff argues that Defendant "materially breached
19  the [n]ote and [d]eed of trust by unilaterally plac[ing] him into
20  a trial modification, withdr[awing] an increased payment without
21  notice, refus[ing] to apply a valid March 2011 payment, and
22  refus[ing] payments after March 2011." (Pl.'s Resp. at 15.)

23      The pertinent provisions of Plaintiff's deed of trust—Section
24  3 (escrow items) and Section 5 (property insurance)—provide that:

25          3. Funds for Escrow Items.  Borrower shall pay to
            Lender on the day Periodic Payments are due under the
26          Note, until the Note is paid in full, a sum (the 'Funds')
            to provide for payments of amounts due for: (a) taxes and
27          assessments and . . . (c) premiums for any and all
            insurance required by Lender under Section 5 . . . .
28          These items are called 'Escrow Items.'

Page 23 - FINDINGS AND RECOMMENDATION

1

2                    . . . .

3          5.  Property Insurance.  Borrower shall keep the
   improvements now existing or hereafter erected on the
   Property insured against loss by fire . . . .

4
          If the Borrower fails to maintain any of the
5   coverages described above, Lender may obtain insurance
   coverage,    at    Lender's    option    and    Borrower's
6   expense. . . . Any amount disbursed by Lender under this
   Section 5 shall become additional debt of Borrowers
7   secured by this Security Instrument.  These amounts shall
   bear interest at the Note rate from the date of
8   disbursement and shall be payable, with such interest,
   upon notice from Lender to Borrower requesting payment.

9

10  (Compl. Ex. 1 at 4, 6.)

11       Paragraph 9 of the complaint indicates that Defendant

12  unilaterally placed Plaintiff into a trial modification in February

13  of 2011, which "increased Plaintiff's monthly payment from $975.49

14  to $1,917.47, purportedly in part to provide for escrow payments

15  for taxes and insurance." (Compl. ¶ 9.)  However, "Plaintiff had

16  been and continues to pay taxes and insurance for the Property on

17  his own—outside of escrow." (Compl. ¶ 9.)  On April 13, 2011,

18  Defendant sent Plaintiff a Notice of Placement of Insurance,

19  "effective from January 27, 2011 to January 27, 2012," (Compl. ¶

20  12), stating:

21       We have enclosed a policy for fire insurance on your
        property obtained by [Defendant]. The annual premium for
22       this coverage is $634.00 which has been advanced on your
        behalf as provided by your loan documents.  If you
23       currently have an escrow account on your mortgage, we
        have paid the premium from the escrow account and will
24       adjust your monthly payment.  If you do not have an
        escrow account, please send us your check to reimburse
25       the amount advanced.  If we do not receive payments
        within thirty (30) days, we will establish an escrow
26       account and adjust your monthly mortgage payments
        accordingly.

27

28

Page 24 – FINDINGS AND RECOMMENDATION

1    We have placed this insurance on your property because we
2    have not received satisfactory evidence of insurance as
     required by your loan documents. . . .

3           . . . .

4    As stated in two previous letters, we strongly encourage
     you to contact an agent of your choice to obtain a policy
5    that provides adequate coverage.

6    If  you  already  have  obtained  your  own  insurance,
     please . . . send evidence of your insurance . . . .
7

8    (Compl. Ex. 3 at 1.)

9         About  a  year  later,  in  April  2012,  Defendant  "removed  the

10   escrow  collection  from  [Plaintiff's]  account  after  [he posted a]

11   check  for  $4,661.27  to  the  negative  advance."   (Compl.  Ex.  4.)

12   According  to  Plaintiff,  he  "forwarded  [$4,661.21]  to  Defendant

13   after  the  Multnomah  County  Assessor  refunded  [Defendant]'s  property

14   tax  payment  to  [him by mistake]  because  [he]  had  [already]  paid  the

15   taxes."   (Pl.'s  Resp.  at  7);  (see also  Pl.'s  Req.  Judicial  Notice

16   Ex.  2-4  at  2)  (indicating  that  $4,661.27  ($758.70 + 3,143.87 +

17   $758.70)  worth  of  taxes  were  paid  on  the  property—which  had

18   previously  been  divided  into  three  parcels—for  the  year  2011)).

19   According  to  Plaintiff,  the  numbers  simply  do  not  add  up:

20        Plaintiff's  [p]roperty  taxes  were  around  $4,661.27  per
          year  ($388.44  per  months).   The  premium  for  [Defendant]'s
21        actual  force-placed  insurance  purchased  . . .  in  April
          2011  . . .  was  $634  per  year  ($52.83  per  month),  which
22        [Defendant]  further  indicated  would  not  become  an  escrow
          charge  or  result  in  a  payment  charge  [for]  at  least
23        [thirty days].   Together,  these  charges  would  have  been
          $441.27  per  month  when  [Defendant]  eventually  force-
24        placed  insurance  in  April  2011  and  if  [Defendant]  paid
          the  [p]roperty  taxes.   This  figure  is  [still]  $500.71
25        less  than  the  actual  payment  increase,  without  notice,  of
          $941.98  per  month  [($1,917,47-$975.49)]  in  February  2011
26        as  part  of  [Defendant]'s  unauthorized  trial  modification.
          Escrow  charges  do  not  and  cannot  account  for  the
27        difference  in  Plaintiff's  payment  amount.

28

Page 25 - FINDINGS AND RECOMMENDATION

(Pl.'s Resp. at 6.)  Plaintiff also takes issue with the fact that his "mortgage delinquency compounded at the increased payment amount of $1,917.47, plus additional applicable charges, such as . . . those indicated in [Defendant]'s May 21, 2012 letter." (Pl.'s Resp. at 7.)

In *Aurora Aviation, Inc. v. AAR Western Skyways, Inc.*, 75 Or. App. 598 (1985), the Oregon Court of Appeals explained that "[t]he rule in Oregon is that a party seeking to recover damages for an alleged breach of contract must plead . . . either substantial performance on his part *or a valid excuse for his own failure to perform*." *Id.* at 602 (emphasis added).  In the same vein, "[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." *Pub. Market Co. of Portland v. City of Portland*, 171 Or. 522, 588 (1942) (citation omitted). Accepting all well-pleaded facts as true and viewing those facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has stated a plausible breach of contract claim. However, to the extent Plaintiff suggests he may recover emotional distress damages for breach of contract, (Compl. ¶ 32), Defendant's motion to dismiss should be granted.  *See Richard v. Deutsche Bank Nat. Trust Co.*, No. 3:09-cv-00123-SI, 2012 WL 1082602, at *9 (D. Or. Mar. 30, 2012) ("Under Oregon law, 'damages are not recoverable in contract for purely emotional distress.'" (citing *Keltner v. Wash. County*, 310 Or. 499, 510 (1990))).

///

///

Page 26 - FINDINGS AND RECOMMENDATION

## IV. CONCLUSION

For the reasons stated, Plaintiff's request (ECF No. 14) for judicial notice should be GRANTED; Defendant's request (ECF No. 16) for judicial notice should be DENIED; and Defendant's motion (ECF No. 11) to dismiss should be GRANTED in part and DENIED in part. Specifically, Plaintiff's FDCPA claim should be dismissed, Plaintiff's FCRA claim under § 1681s-2(a) should be dismissed with prejudice, and Plaintiff's claim for emotional distress damages stemming from an alleged breach of contract should be dismissed with prejudice. Plaintiff's UDCPA, UTPA, IIED, and breach of contract claims are sufficiently plead. For those claims not dismissed with prejudice, Plaintiff should be given fourteen (14) days to amend, if it can be done consistent with Rule 11.

## V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **September 16, 2013**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **October 3, 2013**. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this __27th__ day of August, 2013.

DENNIS J. HUBEL
United States Magistrate Judge

Page 27 - FINDINGS AND RECOMMENDATION